In re Julie Ann BROOKS, Debtor.

Julie Ann Brooks, Plaintiff,

v.

Education Credit Management Corporation (ECMC), Defendant.

Bankruptcy No. 07–31702.
Adversary No. 07–3220.

United States Bankruptcy Court, D. Minnesota.

May 20, 2009.

William L. Bodensteiner, Bodensteiner Law Firm, Austin, MN, for Plaintiff.

Henry T. Wang, Gary Plant Mooty Mooty & Bennett PA, Minneapolis, MN, for Defendant.

## ORDER FOR JUDGMENT DETERMINING DISCHARGEABILITY

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court on May 6, 2008, at 9:30 a.m., for trial on the

debtor's 11 U.S.C. § 523(a)(8) complaint against the student loan assignee defendant. William L. Bodensteiner appeared on behalf of the debtor, Julie Ann Brooks. A.L. Brown and Henry Wang appeared on behalf of Educational Credit Management Corporation (ECMC). At the conclusion of trial, the Court took the matter under advisement. Based upon all of the files, records and proceedings herein, the Court being now fully advised makes the following order pursuant to the Federal and Local Rules of Bankruptcy Procedure:

## I. FINDINGS OF FACT

The parties stipulated to several facts before trial on this matter. These findings incorporate those stipulations.

### a. The Debtor's Personal History

The debtor, Julie Ann Brooks, is 48 years old. Brooks is divorced with three children ages 15(C.B), 18 (Briana) and 19 (Allyson). C.B. lives with her father in Austin, Minnesota. Briana does not live with either parent. Allyson lives with Brooks but was expected to move out in May, 2008. By court order, Brooks is required to pay $60 per month in child support arrearages totaling $6,892.

Brooks was the victim of sexual abuse during her childhood and during her adulthood. She has been diagnosed with alcohol dependence, depression, post-traumatic stress disorder, and irritable bowel syndrome.[1] Brooks has received in-patient treatment for her mental illnesses and addiction eight times over her lifetime. She underwent in-patient treatment during 1999, in approximately August of 2000, and from January 2003 to mid-February 2003. Brooks first sought alcohol dependence treatment at age 27. She has a history of alcoholic relapse, with a total of six relapses. These relapses have occurred periodically in approximately 1993, 1999, winter of 2001 or early spring of 2002, early 2003, 2004, and from late 2007 to early 2008. As of the date of trial, Brooks' most recent relapse was on February 21, 2008, two days after being deposed in this matter. She attributes the relapse to stress from the court case.

Brooks has days when she can function well and days when she cannot function because of her mental illnesses. She credibly testified to and demonstrated memory loss. She currently attends Alcoholics Anonymous at least once per week, is planning to seek counseling, and intends to make an appointment with a psychiatrist for appropriate medication therapy. Brooks recently underwent a Rule 25 chemical dependency evaluation which recommended in-patient treatment.

Brooks also has a significant history of convictions for Driving Under the Influence (DUI). The parties stipulated to four convictions for DUI in Minnesota in 1998, 2001, 2003, and 2004. Her most recent conviction in 2004 was at the felony level. Brooks was incarcerated for two and a half years as a result of the felony conviction, and was released to probation on August 21, 2006.

The Social Security Administration (SSA) determined Brooks disabled as of January 1, 1997. SSA determined that she was eligible for Supplemental Security Income disability benefits in July of 2002.

### b. The Debtor's Employment and Education History

Brooks has not been employed since 2001. She earned a bachelor's degree in psychology from the University of Minne-

---

1. The majority of the evidence in this case was presented through Ms. Brooks' testimony. The Court finds that she testified credibly and truthfully.

sota in 1982. From her college graduation to 1989, Brooks was employed as a case manager and counselor for individuals with traumatic brain injuries at Opportunity Partners in the Twin Cities. In 1989, Brooks moved to Brainerd, Minnesota, where she became employed as a case manager, counselor, and instructor in Special Education at a vocational college. Brooks was forced to leave this employment because of budget cuts in 1996. From 1996 to 1998, she was employed as a waitress. In 1998, Brooks enrolled in a graduate program at Saint Cloud State University in Saint Cloud, Minnesota to earn a master's degree. The educational loans Brooks now seeks to discharge were obtained to fund her attendance in this graduate program. She did not complete the master's degree program. The stress of being separated from her children caused an alcoholic relapse. Brooks' final employment in her field was between December 2000 and March 2001 as a living-skills instructor for young women at Bear Creek Services. Brooks left this employment when she suffered another alcoholic relapse. She was employed briefly at SportMart in late 2001. That was her last employment.

Brooks has applied for two positions in recent years: at Target and at Shopko during 2007 and 2008. She did not receive either position. Brooks believes her felony conviction prevents employment in her field, and she has not sought employment in her field since her release from prison in 2006. Brooks has been working with a job counselor through the Social Security disability program, but has not found employment through that service.

The record unequivocally demonstrates that Brooks is not capable of obtaining or maintaining consistent employment. Even temporary or part-time employment is out of Brooks' reach because of her disability,

mental illnesses, frequent alcoholic relapses and in-patient hospitalizations, and the triggering effect of stress. While she has taken limited action in pursuit of employment, her disability and mental health problems present fundamental obstacles to obtaining and maintaining a job.

c. **The Debtor's Income and Expenses**

Brooks' sole source of income is her disability benefit. The parties stipulated that her monthly net income from these benefits, based on the most recent tax year, is $1,086. She has no savings.

Brooks claims monthly expenses as follows:

| | |
|---|---|
| Rent (no utility payments) | $ 370.00 |
| Auto Insurance—Liability Only | $ 52.00 |
| Auto Gasoline and Oil | $ 80.00 |
| Auto Repairs | $ 30.00 |
| Auto License | $ 3.00 |
| Food | $ 275.00 |
| Clothing | $ 25.00 |
| Laundry and Dry–Cleaning | $ 15.00 |
| Telephone (cellular) | $ 130.00 |
| Medical Beyond Insurance | $ 126.00 |
| Newspapers/Magazines | $ 5.00 |
| Entertainment | $ 5.00 |
| Misc./Cosmetics/Toiletries/Supplies | $ 10.00 |
| Cigarettes | $ 100.00 |
| Child Support Arrearages | $ 60.00 |
| Social Security Recapture | $ 50.00 |
| Probation Fees | $ 10.00 |
| **Total** | **$1,346.00** |

ECMC challenges Brooks' expenses for food, cellular telephone, and cigarettes as unreasonable luxury expenses. The Court finds all but the cigarettes to be reasonable necessary living expenses presently and for the foreseeable future, and concludes that likely increases to her basic minimal expenses are to be reasonably expected.

First, it should be noted that Brooks pays only $370 per month for rent, with no utility payments. The home she rents belonged to her recently-deceased uncle, and now belongs to her brother. Brooks currently resides in this home through an informal agreement, by the grace of her brother, and the continuity of the arrangement is uncertain. Additionally, Brooks' car is a 1995 Buick Skylark previously owned by her now-deceased uncle. The Court notes that though this vehicle is more than a decade old, Brooks did not include replacement costs in her monthly expenses, and provided a likely understated expense for vehicle maintenance and repair.

Excepting the cigarette expense, Brooks' monthly expenses are reasonable and necessary living expenses. She spends $275 on food for herself and her adult daughter, whom she believed would soon be moving out. However, $275 per month is almost certainly an understatement of the actual cost of food for two people. The Court finds that $275 per month for food for one person, or $8.87 per day in a 31–day month, is reasonable.

Brooks' monthly phone expense of $130 per month is also reasonable. She signed a two-year contract for a cellular telephone for both herself and her 15 year-old daughter. The contract determines the monthly bill, and Brooks cannot cancel the contract without losing her deposit. The expense is not unreasonable given the circumstances.

Eliminating the cigarette expense reduces Brooks' monthly living expense to $1,246. With monthly income of $1,086, she has a monthly deficit of $160. She has no surplus from which to pay any portion of her educational loans. Even if Brooks' expenses were reduced on the items ECMC challenges, such that her phone expense was $50 per month, food was $200 ($6.45 per day), and cigarettes eliminated, Brooks' expenses would be $1,091 per month, still $5 in excess of her income.

d. **The Debtor's Educational Loans Held by the Defendant**

Brooks' educational loans are the result of her enrollment in a master's degree program at Saint Cloud State University in Saint Cloud, Minnesota. There are six separate loans. Brooks has not consolidated the loans; however, both parties treated the loans as consolidated and neither submitted evidence of what her payments would be for each loan individually. Brooks has no surplus income with which to pay any amount in any event.

The six loans are:

| Loan | Disbursement Date | Amount Disbursed | Amount Owed as of April 30, 2008 | Daily Interest Accrual |
|------|-------------------|------------------|----------------------------------|------------------------|
| 01 | May 13, 1998 | $ 2,156.00 | $ 3,907.73 | |
| 02 | July 10, 1998 | $ 3,515.00 | $ 6,371.17 | |
| 03 | July 14, 2998 | $ 592.00 | $ 1,112.78 | |
| 04 | June 14, 1999 | $ 3,168.00 | $ 5,954.11 | |
| 05 | Jan. 11, 1999 | $ 8,500.00 | $14,668.28 | |
| 06 | Jan. 11, 1999 | $ 413.00 | $ 776.10 | |
| **Total** | | **$18,344.00** | **$32,790.17** | **$6.71** |

Brooks made approximately two payments of $157 each on one or more of these loans several years ago. She has not made payments since that time.

### e. The Debtor's Eligibility for the Income Contingent Repayment Program (ICRP)

The Income Contingent Repayment Program (ICRP) is a loan repayment program for educational loans consolidated under the William D. Ford Program. The ICRP was implemented by Congress through its enactment of 34 C.F.R. § 685.209. The plan allows individuals owing on student loan obligations to make payments of the lesser of: (1) a percentage of the amount the borrower would repay over 12 years; or (2) twenty percent of the difference between the debtor's adjusted gross income (AGI) and the Federal Poverty Guideline (FPG). 34 C.F.R. § 685.209(a). The amount owed is determined annually based on the debtor's most recent AGI. 34 C.F.R. § 685.209(a)(5). Under the plan, a debtor may pay nothing. At the end of the 25 year repayment period, the unpaid portion of the debt, including accrued interest, is forgiven. 34 C.F.R. § 685.209(c)(4)(iv). Brooks was not aware of her eligibility for this program until she was deposed for this case by ECMC.

ECMC relies entirely on Brooks' eligibility for the ICRP in its argument that she faces no undue hardship in excluding her student loan obligations from discharge. ECMC has determined that Brooks would pay $43.86 monthly under the ICRP, twenty percent of the difference between her income ($1,086 per month) and the FPG for a single person with no dependents. This payment does not cover the monthly interest on Brooks' student loans. Unpaid interest would continue to accrue over time as she made these payments. At the end of twenty-five years, the unpaid balance (including accrued interest) would be discharged, potentially subjecting Brooks to tax liability in that year. Twenty-five years from now, Brooks will be seventy-three years old.

## II. DISCUSSION

### a. Dischargeability of Education Loan Debts

11 U.S.C. § 523(a)(8) states in relevant part:

"A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependants, for—

(A)(i) an educational benefit overpayment or loan ... or (ii) an obligation to repay funds received as an educational benefit ... or (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual."

The debtor has "the burden to show undue hardship by a preponderance of the evidence." *Jesperson v. U.S. Dep't of Educ., et al. (In re Jesperson)*, 366 B.R. 908, 914 (Bankr.D.Minn.2007), citing *Reynolds v. Pa. Higher Educ. Assistance Agency, et al. (In re Reynolds)*, 425 F.3d 526, 529 (8th Cir.2005) (reh'g denied 2006).

### b. Undue Hardship in the Eighth Circuit

The statute does not define "undue hardship." *In re Reynolds*, 425 F.3d at 531 (8th Cir.2005). Undue hardship is more than normal adversity. *Berscheid v. Educ. Credit Mgmt. Corp. (In re Berscheid)*, 309 B.R. 5, 11 (Bankr.D.Minn. 2002). It does not require certainty of financial ruin. *Cumberworth v. U.S. Dep't of Educ. (In re Cumberworth)*, 347 B.R. 652, 658 (8th Cir.BAP2006) (undue hardship does not mean "certainty of financial

hopelessness" or indefinite and extraordinary hardship; it is fact-specific and depends on the circumstances of each case.)

■ To determine undue hardship, the Eighth Circuit has adopted a totality of the circumstances test. *In re Reynolds,* 425 F.3d 526, 531–32 (8th Cir.2005). In the totality of the circumstances test, the court looks to whether the debtor is able to pay the student loan obligation while maintaining a minimal standard of living. *Long v. Educ. Credit Mgmt. Corp. (In Re Long),* 322 F.3d 549, 554–55 (8th Cir.2003) ("Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt— while still allowing for a minimal standard of living—then the debt should not be discharged.")

■ The court considers three factors: "(1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case." *Id.* at 554, citing *Andresen v. Neb. Student Loan Program (In re Andresen),* 232 B.R. 127, 132 (8th Cir.BAP1999).

### i. The Debtor's Past, Present, and Future Income

■ Brooks currently earns income solely through her Social Security Supplemental Income disability benefits. She has not earned income through employment since 2001. In its trial brief, ECMC relies heavily on *Frech* to argue that a debtor must show that he or she has "done everything possible" to maximize income.

*N.D. State Bd. of Higher Educ. v. Frech (In re Frech),* 62 B.R. 235, 241 (Bankr. D.Minn.1986). ECMC's reliance on the *Frech* line of cases is misplaced.[2] *Reynolds v. Pa. Higher Educ. Assistance Agency,* 303 B.R. 823, 836 N. 14 (Bankr.D.Minn. 2004).

■ Under the totality of the circumstances test, the court must consider any "significant earning capacity" of the debtor. *Collins v. Educ. Credit Mgmt. Corp, et al. (In re Collins),* 376 B.R. 708, 714 (Bankr.D.Minn.2007), citing *Winsborough v. U.S. Dep't of Educ. (In re Winsborough ),* 341 B.R. 14, 18 (Bankr.W.D.Mo. 2006). A debtor's attempts to obtain employment is one factor for the court to consider in determining earning capacity. Compare *Strand v. Sallie Mae Serv'g Corp., et al. (In re Strand),* 298 B.R. 367, 375 (Bankr.D.Minn.2003) (debtor had "made expansive efforts job searching and could not earn more income) to *In re Collins,* 376 B.R. at 715 (debtor had "not adequately explored" employment opportunities and had the ability to earn more income). "Personal lifestyle decisions" which reduce a debtor's income must also be evaluated by the Court in determining earning capacity. *In re Berscheid,* 309 B.R. at 9–10, 13 (debtor did not seek out additional income and spouse chose to stay at home rather than be employed); *In re Collins,* 376 B.R. at 712, 715 (debtor "voluntarily selected" more difficult avenue of solo practice as chiropractor rather applying for open positions with established practices).

Brooks has only applied for two jobs since 2007. However, the evidence in this

---

**2.** In *Frech,* the maximization element was part of the court's inquiry into good faith under the *Brunner* test. *In re Frech,* 62 B.R. at 241. In the Eighth Circuit, good faith is one factor in the totality of the circumstances, but there is not a comparable failure of undue hardship if good faith is not adequately shown. *In re Long,* 322 F.3d at 554. (discussing the Brunner test and adopting the less restrictive totality of the circumstances test).

case demonstrates that Brooks has no significant earning capacity. Her periodic alcoholic relapses, frequent "bad days" due to mental health problems, and occasional but lengthy in-patient treatments make her an unreliable employee. Brooks' disabilities and resultant inability to earn income through employment are not lifestyle choices. Given these circumstances, she has maximized her income by obtaining disability benefits. Therefore, the Court does not impute additional income to Brooks. Her current monthly income is $1,086. All indications are that she will remain exclusively dependent upon her disability benefits, and her monthly income will not exceed this amount in the foreseeable future.

### ii. The Debtor's Reasonable Necessary Living Expenses

Living expenses are reasonable when they are "modest and commensurate with the debtor's resources." *DeBrower v. Pa. Higher Educ. Assistance Agency, et al. (In re DeBrower)*, 387 B.R. 587, 590 (Bankr.N.D.Iowa 2008); *Limkemann v. U.S. Dep't of Educ. (In re Limkemann)*, 314 B.R. 190, 195 (Bankr.N.D.Iowa 2004). The total reasonableness of monthly expenses will outweigh some variation among individual line items. *Halverson v. U.S. Dep't of Educ, et al. (In re Halverson)*, 401 B.R. 378 (Bankr.D.Minn.2009) ("Debtors ... are 'not expected or required to implement every conceivable cost-saving measure' so long as the total expenses are minimal."), citing *In re Limkemann*, 314 B.R. at 195; *In re Cumberworth*, 347 B.R. at 659 (bankruptcy court examines reasonableness of total

monthly expenses), citing *Cline*, 248 B.R. at 351.

A debtor's living expenses are necessary when they play a "primary causal role in the provision and maintenance of the minimal standard of living." *Race v. Educ. Credit Mgmt. Corp., et al. (In re Race)*, 303 B.R. 616, 624 (Bankr.D.Minn. 2004). Luxury items are not necessary or reasonable. *Soler v. U.S. Dep't of Health and Human Serv., et al. (In re Soler)*, 261 B.R. 444, 466 (Bankr.D.Minn.2001) (debtor's expenses did not include "luxury items" for the court to reduce).

Brooks' monthly expenses are both necessary and reasonable. ECMC challenges the monthly cellular telephone expense of $130. A cellular telephone is not a luxury when it is a debtor's only phone, as it is in this case. *Pollard v. Superior Cmty. Credit Union (In re Pollard)*, 306 B.R. 637, 646 (Bankr.D.Minn. 2004). The monthly bill reflects the fact that Brooks signed a contract for a phone plan for both herself and her fifteen year-old daughter. To break this contract, she would be forced to forfeit her deposit. Under these circumstances, the phone bill is not an unreasonable expense.

ECMC also challenges Brooks' monthly food expense of $275.[3] A survey of cases in the Eighth Circuit regarding food expenses shows a wide range of reasonableness. See e.g., *Powers v. Sw. Student Serv. Corp., et al. (In re Powers)*, 235 B.R. 894, 899 (Bankr.W.D.Mo.1999) (approximately $400 per month for food for family of three was clearly an underestimation); *In re Strand*, 298 B.R. at 372 ($275 per month for food for family of two

---

**3.** In its trial brief, ECMC argues that Brooks' food expense is unreasonable because it is higher than the Federal Department of Agriculture baseline poverty level for food expenses. Reliance on federally determined poverty levels is seriously misplaced. Just as the FPG is not dispositive for reasonable expenses overall, federal guidelines on poverty food expenses is not dispositive in this inquiry.

reasonable, but "probably understated"); *In re Pollard,* 306 B.R. at 645 ($400 per month for food reasonable for family of three); *Lee v. Regions Bank Student Loans, et al. (In Re Lee),* 352 B.R. 91, 93, 95 (8th Cir. BAP 2006) (debtor spent $350 per month for food for family of three, finding of reasonableness not erroneous); *In re Halverson,* 401 B.R. 378, 2009 WL 396112 (Bankr.D.Minn.2009) ($375 per month for food for two people reasonable); *In re Limkemann,* 314 B.R. at 197 ($200 per month for food for two people "extremely modest"); *In re Soler,* 261 B.R. at 453 N. 4 ($500 per month for food reasonable for a busy professional who eats lunch on the go, lives in someone else's house, and does not feel comfortable using kitchen); *Groves v. Citibank NA, et al., (In re Groves),* 398 B.R. 673, 682–83 (Bankr. W.D.Mo.2008) ($400 per month for food for one person reasonable). Given this range and the fact that $275 per month is only $8.87 per day, Brooks' food expenses are necessary and reasonable.

 ECMC appropriately challenges Ms. Brooks' cigarette expenses. Cigarettes are not a reasonable necessary living expense. *In re Williams,* 233 B.R. 423, 429 (Bankr.D.Mo.1999) (cigarettes a "luxury expense"); *In re Clark,* 273 B.R. 207, 210–11 (Bankr.D.Iowa 2002) (debtor's cigarette and nicotine patch expenses are paid with "discretionary income"); *Jesperson v. U.S. Dep't of Educ., et al.,* 366 B.R. 908, 912 (Bankr.D.Minn.2007) ("questionable whether cigarettes constitute a legitimate expense of a basic needs budget") (aff'd on finding of undue hardship). The Court therefore reduces Brooks' monthly expenses by $100, the cost of her cigarette expenditures. Accordingly, Brooks total reasonable and necessary living expenses are at least $1,246 per month. She therefore has a minimum deficit of $160 per month. Because she does not have the funds to pay her student loan debt, the debt presents an undue hardship to Brooks.

### iii. Other Relevant Facts and Circumstances

 The third part of the totality of circumstances test requires the court to examine all other relevant facts and circumstances in the case. *In re Long,* 322 F.3d at 554. These circumstances may include non-pecuniary concerns, such as the effect of the debt on the debtor's mental health. *In re Reynolds,* 425 F.3d at 532–33.

### The Debtor's Mental Health

 Courts should examine the effect of a debt on the health and well-being of a debtor separately from its effect on future employment and income opportunities. *In re Reynolds,* 425 F.3d at 533 N.6. See also *In re Halverson,* 401 B.R. 378, 2009 WL 396112 (Bankr.D.Minn.2009) (considering stress the debt caused on the debtor's marriage). In *Reynolds,* the Eighth Circuit Court emphasized that the totality of the circumstances test is flexible and allows courts to "respond appropriately to 'unique facts and circumstances.'" *In re Reynolds,* 425 F.3d at 532, citing *In re Long,* 322 F.3d at 554. With that overarching principle in mind, the Eighth Circuit held that when "financial obligations are likely to undermine a debtor's health," a bankruptcy court does not abuse its discretion in weighing that likelihood in its analysis. *Id.* at 532–33. Putting it more strongly, the Eighth Circuit noted, "We will not adopt an interpretation of 'undue hardship' that causes the courts to shut their eyes to factors that may lead to disaster, both personal and financial, for a suffering debtor." *Id.* at 533.

Brooks has experienced periodic and regular alcoholic relapses as well as in-

patient treatments due to stressful conditions and circumstances in her life. Her most recent relapse was as a result of the stress of this proceeding. In short, financial distress has a significantly detrimental effect on Ms. Brooks' mental health and sobriety. The burden of an ever-increasing student loan debt threatens Brooks' sobriety and mental stability. The third prong of the totality of the circumstances test therefore supports that the educational loans present an undue hardship to Brooks.

### The Income Contingent Repayment Program (ICRP)

Bankruptcy courts in all of the circuits have grappled with the ICRP since its implementation. In the 6th Circuit, failure to enroll in the ICRP goes to the good faith component of the *Brunner* test, but is not dispositive. *In Re Barrett*, 487 F.3d 353, 364 (6th Cir.2007). The 11th Circuit treats the ICRP similarly. *In Re Mosley*, 494 F.3d 1320, 1327 (11th Cir.2007). On the other side, the 9th Circuit weighs the ICRP heavily in the *Brunner* good faith prong. *In Re Mason*, 464 F.3d 878, 885 (9th Cir.2006), citing *Penn. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 500 (9th Cir. BAP 2002). The 4th Circuit takes the same approach. *In Re Frushour*, 433 F.3d 393, 402–3 (4th Cir.2005).

The Eighth Circuit has yet to specifically decide the issue. District courts throughout the circuit have treated the ICRP differently, but the weight of authority is to treat the ICRP as one factor of many in the totality of the circumstances test.[4] *In re Lee*, 352 B.R. at 95; *In re Collins*, 376 B.R. at 716, citing *In re Lee*, 352 B.R. at 95; *Educ. Credit Mgmt. Corp. v. Jesperson (In re Jesperson)*, 2007 WL 4105221 (D.Minn.2007) (aff'g the bankruptcy court's finding of undue hardship), citing *In re Lee*, 352 B.R. at 95; *In re Halverson*, 401 B.R. 378, 2009 WL 396112 (Bankr.D.Minn.2009), citing *In re Lee*, 352 B.R. at 95. Courts considering the ICRP as a factor evaluate both the benefits and the drawbacks of the program for the individual debtor within his or her unique circumstances. *Ford v. Student Loan Guarantee Found. of Ark. (In re Ford)*, 269 B.R. 673, 677–78 (8th Cir. BAP 2001) (". . . given the unlikelihood that the Debtor will ever make more money than she does right now, this would result in her carrying around a very large and ever-increasing debt until it is forgiven when she is 87 years old."); *In re Strand*, 298 B.R. at 376–77 ("derivative financial woes"

---

**4.** Some bankruptcy courts in the circuit have taken extreme positions regarding the ICRP as either dispositive or completely irrelevant. See e.g., *May v. Tex. Higher Educ. Coordinating Bd., et al. (In re May)*, 368 B.R. 850, 858 (Bankr.D.Neb.2007) (". . . the fact that payments made under an income-contingent repayment plan would not retire or significantly reduce the debt does not establish grounds for a finding of undue hardship"), citing *Long v. Educ. Credit Mgmt. Corp.*, 292 B.R. 635, 639 (8th Cir. BAP 2003); *In Re Winsborough*, 341 B.R. 14, 21 (Bankr.W.D.Mo.2006) (under the ICRP, the "minimum payments" should be manageable even though the debtor would only pay $10.08 per month toward a more than $27,000 debt). Some panels of the 8th Circuit BAP, without discussion of the issue or reasoning behind its treatment, have recently taken this extreme approach. See *Parker v. Gen. Revenue Corp., Sallie Mae Serv., et al. (In re Parker)*, 328 B.R. 548, 553 (8th Cir.BAP2005) (debtor would make payments of $136.33 per month on $69,794.17 in educational loans under ICRP); *Long v. Educ. Credit Mgmt Corp.*, 292 B.R. 635, 639 (8th Cir. BAP 2003) (debtor could pay $54 per month on $61,800 in educational loans; the repayment period was less than the average mortgage). In at least one instance, a court refused to consider eligibility in ICRP at all. See *In re Berscheid*, 309 B.R. 5, 13 (Bankr. D.Minn.2002) ("This is a program which dooms a debtor to perpetual indebtedness for student loan obligations.")

of interest accrual, preclusion from obtaining credit, possible resultant denials of rental application, future tax liability all to be considered when evaluating the ICRP's value to the debtor); *Fahrer v. Sallie Mae Serv'g Corp., et al.* (*In re Fahrer*), 308 B.R. 27, 35 (Bankr.D.Mo.2004) ("The Court must consider the consequences of Debtor's potential participation in the ICRP and the efficacy of that relief under the circumstances.")

There are a number of reasons why a debtor's eligibility for ICRP and the minimal payments under that program are not dispositive under a totality of the circumstances inquiry. First, the ICRP and the Bankruptcy Court have differing purposes and goals.

"... [T]he availability and terms of the ICRP should not be given undue weight under the totality of the circumstances analysis because it serves a fundamentally different purpose than the discharge provisions (and exceptions thereto) of the Bankruptcy Code. A survey of the legislative history behind legislation related to the ICRP indicates that its primary goal is to assist borrowers in *avoiding default*. In contrast, the Bankruptcy Code serves to provide a *fresh start* to 'honest but unfortunate debtors,' most of whom have already defaulted on their obligations (including student loans)." [citations omitted]

*In re Lee*, 352 B.R. at 96 (emphasis added). See also *In re Limkemann*, 314 B.R. at 196 (discussing difference between delay of payment and fresh start); *Korhonen v. Educ. Credit Mgmt. Corp.* (*In re Korhonen*), 296 B.R. 492, 497 (Bankr.D.Minn. 2003) (bankruptcy provides a fresh start, while the ICRP does not); *In re Halver-*

son, 401 B.R. 378, 2009 WL 396112 (Bankr. D.Minn.2009) (citing *In re Lee*, 352 B.R. at 96–97); *In re Cumberworth*, 347 B.R. at 661 (noting that the ICRP considers the current financial situation in any given year, while the bankruptcy court considers the foreseeable future).

To argue the ICRP prevents undue hardship for all debtors is to argue that making any payment is as good as paying down the debt.[5] See e.g. *In re Lee*, 352 B.R. at 96; *In re Korhonen*, 296 B.R. at 496. Courts in this Circuit have held that the inquiry is to the debtor's ability to repay the loan, not simply to make payments. As the court wrote in *In re Strand:*

"... what the Eighth Circuit said in *Long* is: '[I]f the debtor's reasonable future financial resources will sufficiently cover *payment of the student loan debt*—while still allowing for a minimal standard of living—then the debt should not be discharged.' *Long*, 322 F.3d at 554–555 (emphasis added). The Eighth Circuit did not say nonpayment, or zero payment, or payment toward accumulating interest only on the debt. This Court understands that by 'payment of the student loan debt,' the Court of Appeals meant what it said, that is, payment of the underlying outstanding debt itself."

*In re Strand*, 298 B.R. at 377. See also *In re Halverson*, 401 B.R. 378 (Bankr. D.Minn.2009) ("The task 11 U.S.C. § 523(a)(8) places before a court is to determine whether the loans are an undue hardship for the plaintiff, not whether the ICRP payments are an undue hardship.") At least one court has found no undue hardship where the debtor who qualified

---

5. For a discussion of the difference between merely making payments on the debt and making payments toward paying down the debt, see Terrence L. Michael and Janie M. Phelps, *Judges?!—We Don't Need No Stinking Judges!!!*, 38 Tex. Tech L.Rev. 73, 104–5 (2005–2006).

394

for the ICRP would likely have significantly increased future income and be able to retire the entire debt under the program. *In re Collins,* 376 B.R. at 717.

Because of the differing purposes, the economic evaluations undertaken by ICRP administrators and Bankruptcy Court judges differ significantly. Section 685.209 requires ICRP administrators to place debtors on the lesser of two payment plans: the twenty percent or the twelve year. 34 C.F.R. § 685.209(a)(2)(i)-(ii). The debtor's circumstances are not relevant; only the amount of the monthly payments is considered in choosing the plan. *Id.* "Under the ICRP, a debtor is *presumed* to have the ability to pay 20% of the difference between her adjusted gross income and the poverty level for her family size ... In contrast, a bankruptcy court engages in a case-by-case analysis of a debtor's income in relation to her reasonable expenses." *In re Lee,* 352 B.R. at 96 (emphasis original).

The ICRP's use of the FPG as a baseline for determining "discretionary income" also stands in sharp contrast to the totality of the circumstances inquiry. 34 C.F.R. § 685.209(a)(3). Numerous courts in the Eighth Circuit have affirmed that "minimal standard of living" is not determined dispositively by the FPG. See *In re Berscheid,* 309 B.R. at 12 ("The debtor need not live below the poverty line to obtain a discharge of a student loan obligation ..."); *In re Cumberworth,* 347 B.R. at 660 (pointing to the difference between FPG and reasonably necessary expenses); *In re Limkemann,* 314 B.R. at 195 ("The fact that the household income may not be at or below poverty guidelines does not

preclude a finding of undue hardship."), citing *Meling I,* 263 B.R. at 280. See also *In re Fahrer,* 308 B.R. 27, 33–34 (Bankr. W.D.Mo.2004) (poverty guidelines not dispositive); *In re Powers,* 235 B.R. 894, 900 (Bankr.W.D.Mo.1999) (status in relation to poverty guidelines listed as one factor of many to consider). The Eighth Circuit has never required that a debtor live at or below the poverty line to show reasonable monthly expenses.

Most important, the bankruptcy court's duty to determine undue hardship for individual debtors and their dependents remains unchanged in 11 U.S.C. § 523(a)(8). *In re Lee,* 352 B.R. at 96 N. 13. Using the ICRP as a dispositive consideration would eliminate the Bankruptcy Court's function in undue hardship cases.[6] *In re Limkemann,* 314 B.R. at 195 ("... [ICRP] deprives the bankruptcy court of its role in determining undue hardship.") Had Congress intended a strict mathematical formula to determine undue hardship, it could have put such a formula into 11 U.S.C. § 523(a)(8). *In re Lee,* 352 B.R. at 96 N. 13. The statute remains the same, and the ICRP "cannot trump the Congressionally mandated individualized determination of undue hardship." *In re Korhonen,* 296 B.R. at 496.

### Drawbacks of the ICRP

Some debtors may benefit significantly from participation in the ICRP, avoiding default until their financial situation improves. However, the program does have drawbacks the Court must consider in the totality of the circumstances test. When a debtor's payments are less than the monthly interest amount, the interest continues to accrue; the debt in-

**6.** That ICRP administrators consider undue hardship eradication a *fait accompli* is evident from the ICRP calculator webpage, which states: "The income contingent repayment plan gives you the flexibility to pay your

loan(s) *without undue financial hardship."* (emphasis added) (http://www.ed.gov/offices/OSFAP/DirectLoan/RepayCalc/dlentry2.html last accessed 03/09/2009).

creases over time even as the debtor makes his or her scheduled payments. *In re Korhonen,* 296 B.R. at 496–97; *In re Strand,* 298 B.R. at 375; *In re Ford,* 269 B.R. at 677. After the twenty-five year repayment period, this increased debt is cancelled by the Secretary, resulting in income to the debtor. *In re Korhonen,* 296 B.R. at 496–97. This income may be tax able where the debtor is not insolvent and places what is likely to be an insurmountable tax burden on the debtor. *In re Berscheid,* 309 B.R. at 13 ("... [Debtor] would go to his grave either indebted to [Defendant] or, if not, indebted to the IRS ..."); *In re Lee,* 352 B.R. at 97 (cancelled debt treated as tax able income); *In re Limkemann,* 314 B.R. at 196 (cancelled debt leads to "enormous" tax liability), citing *In re Strand,* 298 B.R. at 376–77.

■ For the above reasons, this Court follows the weight of the authority in this circuit and holds that the ICRP is only one of many factors for consideration under the Eighth Circuit's well-established totality of the circumstances test. Eligibility for the ICRP is not dispositive and must be considered in light of each individual debtor's unique situation.

## Brooks and the ICRP

Brooks has no surplus income with which to repay the educational loan debt. Excepting the debt from her general discharge would result in undue hardship. The ICRP does not improve the situation. Under the ICRP, based on twenty percent of the difference in Brook's income from her disability benefits, she would have a monthly payment of $43.86. Brooks currently has a monthly deficit of $160. Even

reducing the categories ECMC challenges, Brooks has a monthly deficit of $5 per month. Brooks' expenses are reasonable, and she does not have the necessary surplus to make the ICRP payments, regardless of her position vis-a-vis the FPG.

Even if Brooks could make the ICRP payments, her student loan debt would still pose an undue hardship because she would never be able to reduce the debt and would not get a fresh start. Were Brooks to make payments of $43.86 per month on her educational loan debt, presently in excess of $32,789.89, her debt would grow over the twenty-five year repayment period according to the following table:

| Payment # | Interest Required (monthly) (at 7.5%) | Payment made (monthly) | Balance— $32,790.17 | Year |
|---|---|---|---|---|
| 12 | $204.06 | $43.86 | $34,712.57 | 1 |
| 24 | $216.03 | $43.86 | $36,778.61 | 2 |
| 36 | $220.23 7 | $43.86 | $38,895.05 | 3 |
| 48 | $220.23 | $43.86 | $41,011.49 | 4 |
| 60 | $220.23 | $43.86 | $43,127.93 | 5 |
| 72 | $220.23 | $43.86 | $45,244.37 | 6 |
| 84 | $220.23 | $43.86 | $47,360.81 | 7 |
| 96 | $220.23 | $43.86 | $49,477.25 | 8 |
| 108 | $220.23 | $43.86 | $51,593.69 | 9 |
| 120 | $220.23 | $43.86 | $53,710.13 | 10 |
| 132 | $220.23 | $43.86 | $55,826.57 | 11 |
| 144 | $220.23 | $43.86 | $57,943.01 | 12 |
| 156 | $220.23 | $43.86 | $60,059.45 | 13 |
| 168 | $220.23 | $43.86 | $62,175.89 | 14 |
| 180 | $220.23 | $43.86 | $64,292.33 | 15 |
| 192 | $220.23 | $43.86 | $66,408.77 | 16 |
| 204 | $220.23 | $43.86 | $68,525.21 | 17 |
| 216 | $220.23 | $43.86 | $70,641.65 | 18 |
| 228 | $220.23 | $43.86 | $72,758.09 | 19 |

7. 34 C.F.R. § 685.209(c)(5) states that unpaid interest is capitalized until the outstanding principal is ten percent greater than the principal amount when the debtor's monthly payments are less than the accrued interest.

Brooks' liability would reach this amount in the middle of Year 2, at $35,237.21. Interest continues to accrue thereafter but is not capitalized.

| 240 | $220.23 | $43.86 | $74,874.53 | 20 |
| --- | --- | --- | --- | --- |
| 252 | $220.23 | $43.86 | $76,990.97 | 21 |
| 264 | $220.23 | $43.86 | $79,107.41 | 22 |
| 276 | $220.23 | $43.86 | $81,223.85 | 23 |
| 288 | $220.23 | $43.86 | $83,340.29 | 24 |
| 300 | $220.23 | $43.86 | $85,456.73 | 25 |

Not only would Brooks not retire the debt, she would never make a meaningful payment on her loan obligation. In fact, the debt would simply continue to grow over the twenty-five year period as interest accrues. By the end of the repayment period, the debt would be nearly three times as large. The ICRP may be useful to some debtors by allowing them to avoid default until their financial situation improves and they are again able to pay down the debt. Brooks is not such a debtor. Her disabilities and persistent inability to maintain consistent employment augur an indefinitely continuing inability to make meaningful payments on her debt. In light of Brooks' circumstances, the educational loan presents an undue hardship, with or without the ICRP.

### III. CONCLUSION

The student loan exception to discharge was put in place by a Congress concerned that recent graduates would have student loans discharged before embarking on a lucrative career. Brooks is not the type of debtor Congress was attempting to thwart. Brooks' income is not likely to increase in the foreseeable future, her expenses are reasonable, and she has no surplus income. In addition, the stress of the loan will negatively affect her mental health and sobriety to real and meaningful ongoing detriment. Even if she were able to make the payments dictated by the ICRP, Brooks would never make a dent in her student loan debt. The debt would continue to increase until it was finally discharged, potentially leaving her with an extreme tax liability at age seventy-three. The record demonstrates by a preponderance of the evidence that, under the totality of the circumstances analysis, excluding Brooks' education loan obligations from discharge would impose undue hardship.

### IV. DISPOSITION

IT IS HEREBY ORDERED:

1. Julie Ann Brooks' student loan debts constitute an undue hardship for purposes of 11 U.S.C. 523(a)(8) and are accordingly discharged as part of the general discharge entered in her main bankruptcy case 07–31702.

LET JUDGMENT BE ENTERED ACCORDINGLY.